# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ANDREA LAAKSO MAXWELL,
Individually and as Independent
Administrator of the Estate of
William Maxwell, Deceased,

      Plaintiff,

   v.           Case No. 20-CV-386

OUTAGAMIE COUNTY JAIL, et al.,

     Defendants.

## DECISION AND ORDER

### 1. Procedural History

   Shortly before noon on June 28, 2017, William Maxwell, an inmate at the Outagamie County Jail, asked his cellmate to leave their cell so he could use the toilet. (ECF No. 115, ¶ 36.) The cellmate did so, and Maxwell placed a blanket over the window in the door to the cell. (ECF No. 115, ¶ 38.) The cellmate reentered the cell about 45 minutes later and found Maxwell hanging by a bedsheet from the light fixture. (ECF No. 115, ¶ 50.) The cellmate summoned help, and correctional officers got Maxwell down. (ECF No. 115, ¶¶ 50-53.) Although correctional officers and emergency medical

personnel attempted lifesaving measures (ECF No. 83 at 6), it was clear that Maxwell was dead (ECF Nos. 108, ¶ 61; 115, ¶¶ 53-54).

Maxwell's wife, Andrea Laakso Maxwell, "individually and as Independent Administrator of the Estate of William Maxwell, deceased" (ECF No. 36 at 1), sued Outagamie County, the Outagamie County Jail, three jail employees (Scott Koehnke, Fay Geenan, and Ann Gorski), a social worker (Katrina Dorow-Stevens), and the social worker's employer that contracted with Outagamie County to provide medical services to inmates (WellPath). (ECF No. 36.) The plaintiff alleges that the defendants violated Maxwell's rights under the Eighth and Fourteenth Amendments of the United States Constitution. (ECF No. 36, at 12-17.) The plaintiff also alleges that the Outagamie County Jail and Outagamie County are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (ECF No. 36 at 17-20.) Finally, the plaintiff alleges that the defendants violated Article 1, Section 6 of the Wisconsin Constitution. (ECF No. 36 at 21-23.)

All parties have consented to the full jurisdiction of this court. (ECF Nos. 20, 25, 33, 46, 48.) The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

Currently before the court are the defendants' motions for summary judgment. (ECF Nos. 68; 78.) The parties also filed various motions related to experts. The Outagamie County defendants have moved to exclude the opinions of two of the

plaintiff's experts (ECF No. 87), and the plaintiff has moved to exclude the opinions of three defense experts (ECF Nos. 90, 93, 96).

## 2. Facts

The Appleton Police Department arrested Maxwell on June 22, 2017. (ECF No. 108, ¶¶ 1-2.) Because he was extremely intoxicated, he was first evaluated and medically cleared at a hospital before being booked into the Outagamie County Jail. (ECF Nos. 108, ¶¶ 1-5, 8; 109, ¶ 17.) Medical personnel at the hospital had no care or treatment recommendations regarding Maxwell and did not issue any prescriptions. (ECF No. 109, ¶¶ 15-16.) In response to standard questions during the booking process, Maxwell acknowledged using methamphetamine approximately a day before, denied he was currently taking any medication, denied any medical problems, answered "yes" to the question of whether he had ever had any mental health treatment, hospitalization, or medication, and identified "anxiety/depression." (ECF Nos. 83 at 3; 108, ¶ 13; 109, ¶¶ 18-27.) He also stated that he had attempted to kill himself six months before by "run[ning a] car in shop." (ECF Nos. 83 at 3; 108, ¶ 13; 109, ¶ 30.) However, he denied any current suicidal feelings or any current plan of suicide. (ECF No. 108, ¶ 13.) This screening report was available to medical staff throughout Maxwell's incarceration. (ECF No. 108, ¶ 15.)

Because Maxwell had recently consumed alcohol and methamphetamine, he was initially placed in a protective holding cell rather than in the general jail population. (ECF Nos. 108, ¶ 16; 109, ¶ 28.) He was also placed on "red-tag status" due to his reported

recent suicide attempt. (ECF No. 108, ¶ 18.) This meant that, when he was transferred to the general population, he would be assigned a cellmate. (ECF Nos. 108, ¶ 19; 115, ¶ 6.)

Pursuant to a contract with Outagamie County, medical services at the jail were provided by Wellpath, LLC. (ECF No. 109, ¶ 4.) Medical staff attempted to evaluate Maxwell on June 23, 2017 (ECF No. 108, ¶ 23), but he reportedly did not want to be bothered and did not cooperate with the evaluation (ECF No. 108, ¶ 24; *see also* ECF No. 83 at 7).

Also on June 23, 2017, Sarah Faul, a social worker who had previously worked with Maxwell, called the jail and reported that a person (it was Maxwell's mother, but Faul did not identify the person to jail staff) had told her that Maxwell had previously said he "will kill himself before going to prison." (ECF Nos. 108, ¶ 25; 115, ¶ 11; *see also* ECF No. 109, ¶¶ 32-34.) Faul left this information on a voicemail for the Health Services Unit and also spoke to an unknown corrections officer. (ECF No. 108, ¶ 26.) Maxwell's wife, Andrea Maxwell, also called Faul and asked her to make sure that the jail knew that Maxwell was suicidal. (ECF No. 115, ¶ 14.)

A correctional officer reported to the jail's mental health coordinator, Josette Smith, that Maxwell was being "emotional" in the holding cell. (ECF No. 115, ¶ 16.) Smith decided to have Maxwell remain in the holding cell overnight and had Katrina Dorow-Stevens, a Licensed Professional Counselor, follow up the next day. (ECF No. 108, ¶ 27;

4

115, ¶ 17.) Dorow-Stevens worked at the Outagamie County Jail only on Saturdays, every other week. (ECF No. 109, ¶ 6.)

On June 24, 2017, Dorow-Stevens met with Maxwell and conducted a mental health assessment (ECF Nos. 108, ¶ 27; 109, ¶ 36) to see if he could be allowed into the general jail population (ECF No. 108, ¶ 28). Although WellPath had a standard form for completing mental health assessments, Stevens did not bring the form with her to her meeting with Maxwell. (ECF No. 115, ¶ 21.) She reviewed the screening report that was prepared when Maxwell was booked into the jail. (ECF No. 108, ¶ 29.) According to Mental Health Progress Notes regarding Dorow-Stevens's meeting with Maxwell, Maxwell reported that he was anxious to get out of the holding cell so he could call a friend and perhaps be able to post bond. (ECF No. 83 at 2.) He said that "being in the holding cell was making him feel crazy." (ECF No. 83 at 2.) He denied that he had any intention of harming himself or others. (ECF Nos. 108, ¶ 31; 109, ¶ 43.) And in an apparent reference to the call that the jail received from Faul, the notes state, "Client doesn't know why his family could call and tell the jail something like that." (ECF No. 83 at 2.) He reported that he should be on some medications—gabapentin and an antidepressant— "but that he doesn't think he will be here long enough to get them." (ECF No. 83 at 2.) He also reported that the last time he was in the jail he was prescribed buspar. (ECF No. 83 at 2.)

Dorow-Stevens approved Maxwell's transfer to the general jail population but noted he "must have cellmate redtag." (ECF No. 83 at 2; 108, ¶ 34.) Shortly thereafter Maxwell was transferred to the general population (ECF No. 108, ¶ 36), and consistent with his red tag status, he was housed with a cellmate (ECF No. 108, ¶ 37). The fact that Maxwell was on red-tag status was listed on a board outside the jail cellblock. (ECF No. 115, ¶ 7.)

On June 26 and 27 Maxwell called his former wife, Nicole Peterson, and told her he was feeling suicidal. (ECF No. 108, ¶ 38; 115, ¶¶ 26-27.) Peterson did not report these statements to the jail. (ECF No. 108, ¶ 39.) And although jail calls are routinely recorded and accessible to jail supervisors, the jail does not monitor or review those calls as a matter of course. (ECF No. 115, ¶ 28.) According to a subsequent police report, Peterson said that Maxwell would frequently refer to suicide but she never thought he would actually do it and she regarded his statements as attempts to garner pity. (ECF No. 108-20 at 13.)

On the morning of June 28, 2017, Outagamie County Deputy Sheriff Michael Langner accompanied Maxwell to a court hearing regarding a restraining order sought by Maxwell's wife, Andrea. (ECF Nos. 108, ¶¶ 40-41; 109, ¶¶ 50-53.) Langner observed Maxwell cry and act emotional during the hearing, but he stopped crying after leaving the courtroom. (ECF No. 108, ¶¶ 41-43; 115, ¶ 33.) As they were going back to the jail,

Maxwell told Langner, "I guess I made my point." (ECF No. 108, ¶ 44.) Maxwell was placed back into the general population upon his return to the jail. (ECF No. 108, ¶ 51.)

At about 11:40 AM, shortly after he ate lunch, Maxwell asked his cellmate if he could use the toilet and the cellmate left. (ECF Nos. 108, ¶ 52; 109, ¶¶ 56-57; 115, ¶ 36.) Maxwell covered his cell door with a blanket and went inside. (ECF Nos. 108, ¶ 52; 109, ¶ 58; 115, ¶ 38.) This was technically a violation of jail policy (ECF Nos. 108, ¶ 73; 115, ¶ 65), but the jail routinely allowed such coverings as a privacy measure (ECF No. 115, ¶¶ 39, 87).

At 12:27 PM, Koehnke conducted an inmate count. (ECF No. 108, ¶ 53.) By policy, this required Koehnke to physically account for each inmate by having every inmate stand by the door to his cell. (ECF No. 115, ¶¶ 41, 63-64.) Instead, Koehnke allowed inmates to "mill around." (ECF No. 115, ¶ 42.) As for Maxwell, Koehnke testified that he "saw the blanket moving a little bit" and so included Maxwell in the count and moved on to the next cell block. (ECF Nos. 108, ¶ 55; 115, ¶ 45.) Again, this was technically a violation of jail policy (ECF Nos. 108, ¶ 73; 115, ¶ 46), but counting an inmate based on the movement of a blanket covering a window was a common practice (ECF No. 115, ¶ 47).

After the count, at 12:29 PM, Maxwell's cellmate yelled into the cell to see if Maxwell was okay. (ECF No. 115, ¶ 48.) Receiving no response, Maxwell's cellmate "peeked behind" the blanket and saw Maxwell hanging by a bedsheet wrapped around

cell's light fixture. (ECF Nos. 108, ¶ 56; 109, ¶ 60; 115, ¶ 50.) Another inmate pushed the emergency button in the housing unit (ECF Nos. 108, ¶ 56; 115, ¶ 50), and Ann Gorski, an operations assistant who was working in the central control room, answered the emergency call (ECF No. 108, ¶ 57). She immediately reported the emergency to all corrections officers, supervisors, and medical staff, and then called 911. (ECF No. 108, ¶ 59.)

Corrections officers entered Maxwell's cell at 12:31 PM, brought him down and, although Maxwell was blue and lacked any signs of life, did chest compressions until emergency medical personnel arrived. (ECF No. 108, ¶¶ 60-61; 115, ¶¶ 53-54.)

It is undisputed that at no point during his June 2017 incarceration did Maxwell request medical or mental health care from any jail employee. (ECF Nos. 108, ¶¶ 65-66; 109, ¶ 65.) None of the county defendants ever heard Maxwell make any suicidal statements or engage in any suicidal conduct prior to his death. (ECF No. 108, ¶¶ 67-71.)

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all

reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 4. Analysis

#### 4.1. Preliminary Matters

Andrea Laakso Maxwell repeatedly states in the amended complaint and in her briefs that she is asserting claims both individually and as an administrator of Maxwell's estate. However, each claim in the amended complaint is prefaced with a heading indicating that it is made by the "*Estate of William Maxwell* v. Defendants" (ECF No. 36 at 12, 14, 21 (emphasis in original)) or "*Estate of William Maxwell* v. Outagamie County Jail and Outagamie County" (ECF No. 36 at 17 (emphasis in original)). The amended complaint does not identify any claim that Andrea Laakso Maxwell purports to bring on her own behalf. Because the amended complaint does not identify any claim brought by Andrea Laakso Maxwell individually, the court regards the Estate of William Maxwell as the only plaintiff and therefore uses the singular "plaintiff" throughout.

As to the merits of the plaintiff's claims, the Outagamie County Jail is not a suable entity separate from Outagamie County. *See Hermann v. Dunn Cty.*, 761 F. App'x 647, 650

(7th Cir. 2019) (stating plaintiffs "cannot sue parts of the county that are not separate from the county itself") (citing *Whiting v. Marathon Cty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004)); *Wagner v. Wash. Cty.*, 493 F.3d 833, 835 (7th Cir. 2007); *Grow v. City of Milwaukee*, 84 F. Supp. 2d 990, 995-96 (E.D. Wis. 2000). Therefore, it is dismissed as a defendant.

The plaintiff's claim under the Eighth Amendment for cruel and unusual punishment also fails. There is no evidence that Maxwell was incarcerated as punishment for any criminal offense. Rather, he was a pretrial detainee at the time of his death. The claims of pretrial detainees held on probable cause arise under the Fourteenth Amendment's Due Process Clause. *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017). A pretrial detainee does not have a claim under the Eighth Amendment for cruel and unusual punishment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). Therefore, the court will dismiss Count I of the amended complaint. (ECF No. 36 at 12-14.)

The county defendants also argue, "All corresponding claims alleged under the Wisconsin Constitution should also be dismissed for the reasons explained in this Brief" because the Wisconsin Constitution is interpreted consistent with the parallel provisions of the United States Constitution. (ECF No. 70 at 10, fn. 3; *see also* ECF No. 79 at 8 (healthcare defendants making the same argument).) However, the plaintiff's claims under the Wisconsin Constitution must be dismissed for a different reason. Aside from an exception not applicable here, suits for damages are not permissible for violations of the Wisconsin Constitution. *Goodvine v. Swiekatowski*, 594 F. Supp. 2d 1049, 1054 (W.D.

Wis. 2009) (citing *W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 634-35, 460 N.W.2d 787, 792-93 (1990)); *see also Jeffery v. Fuentes*, No. 19-cv-1212-pp, 2021 U.S. Dist. LEXIS 133537, at *9 (E.D. Wis. July 19, 2021) (following *Goodvine*); *Schworck v. City of Madison*, No. 19-cv-312-wmc, 2021 U.S. Dist. LEXIS 86866, at *54 (W.D. Wis. May 6, 2021) (same); *Harper v. Giese*, No. 20-cv-493-pp, 2020 U.S. Dist. LEXIS 223873, at *21 (E.D. Wis. Dec. 1, 2020) (same). Wisconsin law does not have an analogue to 42 U.S.C. § 1983. Consequently, the court must dismiss Count IV (ECF No. 36 at 21-23) of the amended complaint.

Finally, Wellpath and Dorow-Stevens submitted a "Reply to Plaintiff's Responses to Their Proposed Findings of Fact." (ECF No. 123.) "Although Civil Local Rule 56(b)(3)(B) authorizes a reply to address any *additional* proposed findings of fact submitted by a party opposing the summary judgment motion, it does not allow the moving party to reply to the opposing party's response to the moving party's proposed findings of fact." *Arms v. Milwaukee Cty.*, No. 18-CV-1835, 2021 U.S. Dist. LEXIS 64654, at *7 (E.D. Wis. Apr. 1, 2021) (emphasis in original); *Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, No. 20-CV-371, 2022 U.S. Dist. LEXIS 166539, at *3 (E.D. Wis. Sep. 15, 2022). Therefore, in accordance with Fed. R. Civ. P. 12(f), WellPath and Dorow-Stevens's reply (ECF No. 123) is stricken.

### 4.2. Applicable Law

Given the nature of the jail environment, the circumstances that tend to lead to incarceration, and the personal characteristics of persons most likely to be incarcerated,

self-harm and suicide are endemic among jail populations. *See, e.g.*, E. Ann Carson, Bureau of Justice Statistics, *Suicide in Local Jails and State and Federal Prisons, 2000–2019 – Statistical Tables* (Oct. 2021), available at https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf; *Estate of Boncher v. Brown Cty.*, 272 F.3d 484, 486 (7th Cir. 2001); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001). Under the Fourteenth Amendment, "jails have a duty 'to prevent the prisoner from giving way' to the 'unusual psychological strain' caused by incarceration." *Miranda v. Cty. of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (quoting *Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006)).

A failure-to-protect claim under the Fourteenth Amendment regarding pretrial detention requires the court to assess two questions. *Pittman v. Cty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020); *Miranda*, 900 F.3d at 353 (quoting *Kingsley*, 576 U.S. at 395). First, the plaintiff must show that the defendant "acted purposefully, knowingly, or perhaps even recklessly." *Miranda*, 900 F.3d at 353. In the context of a claim of self-harm, this equates to a requirement that the plaintiff show that the defendant was aware of or strongly suspected facts showing a likelihood that the inmate would harm himself. *Pittman*, 970 F.3d at 827. Second, the plaintiff must show that the action (or inaction) was objectively unreasonable. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022). Reasonableness "must be determined in light of the totality of the circumstances." *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020).

While this action has been pending the Court of Appeals for the Seventh Circuit decided two factually similar cases that merit close attention. In *Jump v. Vill. of Shorewood*, 42 F.4th 782 (7th Cir. 2022), an inmate was intoxicated, had overdosed on heroin a few days earlier, had a history of psychiatric treatment, was observed crying and asking for a person that officers presumed to be his boyfriend and whose serious injury led to the inmate's arrest, and exhibited signs of distress, including slamming his body into the cell bars. *Id.* at 793. He killed himself within a few hours of his arrest. In large part because the inmate denied being suicidal, the court concluded that no reasonable finder of fact could find that it was objectively unreasonable for a sergeant to fail to place the inmate on suicide watch and to wait 45 minutes between checks on him. *Id.* at 794.

The court in *Jump* relied on *Pulera v. Sarzant*, 966 F.3d 540 (7th Cir. 2020). In *Pulera* an inmate attempted suicide after two days in jail. *Id.* at 544. Pulera was drunk when he was arrested. During booking he reported that his mother had died a month earlier and his brother had committed suicide about a year ago. *Id.* at 545. But he denied that he had ever contemplated or was presently contemplating suicide. *Id*. During a prior incarceration, Pulera had been placed on suicide watch after he told a nurse that he was depressed following his brother's suicide. But when checking jail records the booking officer did not learn of this fact. *Id* at 546.

Pulera's cousin, who was incarcerated in a nearby cell, told officers at the jail that Pulera was engaging in behavior suggesting that he wanted to harm himself. Pulera

Case 2:20-cv-00386-WED   Filed 11/29/22   Page 13 of 43   Document 126

requested jail officials provide him with medications that he had been prescribed for pain, depression, and anxiety, and stated that his family would be dropping them off. *Pulera* at 546. However, medical staff did not give the medication to Pulera because some of the allotted pills were missing, which they believed could be a sign of abuse. *Id.* at 546. This led to Pulera submitting a second request for his medications wherein he stated, "I need my meds or I can die." *Id.* When medical staff checked on him, they found him to be in no apparent distress. *Id.* Pulera made a third request, begging for his medications. *Id.* at 547. Pulera met briefly with medical staff, who checked his vital signs. *Id.* During that meeting he did not report any concerns, much less thoughts of self-harm. *Id.* A few hours later, Pulera hung himself with bed sheets.

The court concluded that the defendants who booked Pulera into the jail were entitled to summary judgment because "not every prisoner who shows signs of depression … can or should be put on suicide watch." *Pulera*, 966 F.3d at 551 (quoting *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003)). Because Pulera expressly denied he was considering suicide, given "the absence of more or more significant indirect signs, no rational jury could find that [the defendant] unreasonably placed Pulera in general population." *Id*.

The doctor who withheld Pulera's medications likewise was not liable because withholding his medication was reasonable in light of the concern that Pulera was abusing the medications, and there was no evidence that withholding his medications

would lead him to attempt suicide. *Pulera*, 966 F.3d at 552-53. Nurses also reasonably responded to Pulera's requests given that he never indicated that he was depressed, much less suicidal. *Id.* at 553-54. Finally, the actions of correctional officers who responded to his suicide attempt were reasonable despite having "wasted seconds waiting for back-up before entering his cell, cutting him down, and calling an ambulance." *Id.* at 555.

### 4.3. Claims Against the County Employees

#### 4.3.1. Fay Geenan

The plaintiff's brief addresses defendant Fay Geenan only to note that "[d]efendant Officer Geenan was the first correctional officer to the cellblock; she began to close cells so that correctional officers could respond to William's cell" (ECF No. 107 at 7), she received two hours of training each year regarding suicidal inmates (ECF No. 107 at 11), and she received training on conducting inmate counts and welfare checks (ECF No. 107 at 13). The plaintiff does not otherwise develop an argument as to in what way Geenan violated Maxwell's rights under the Fourteenth Amendment. Insofar as the plaintiff may be suggesting that Geenan ought to be liable because her response was not fast enough, the constitution "requires reasonableness, not immediacy." *Pulera*, 966 F.3d at 555 (quoting *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010)). At no point does the plaintiff present facts that could lead a reasonable finder of fact to conclude that Geenan violated Maxwell's rights under the Fourteenth Amendment. *See id.* at 556 ("That

a tragedy … happened under the watch of jail officers, though, does not mean the officers are responsible."). Therefore, the plaintiff's claims against Geenan must be dismissed.

### 4.3.2. Ann Gorski

The plaintiff's theory as to defendant Ann Gorski is that she was responsible for monitoring cellblocks for issues like blankets covering windows. (ECF No. 107 at 16.) Gorski allegedly "recklessly failed to [do so], allowing William to have a blanket cover his cell window for over 45 minutes." (ECF No. 107 at 16.)

However, the plaintiff has failed to present evidence that Gorski was actually responsible for monitoring the cellblocks. The portion of Gorski's deposition that the plaintiff cites in support of that factual assertion (ECF No. 108-23 at 8, 30:5-13) does not support it. Rather, Gorski testified that her job as an operations assistant included monitoring and managing traffic of inmates and officers through doors, observing inmates in the booking process, observing inmates in holding cells, and "observing the building." (ECF No. 108, ¶ 58.) As to the cellblocks, she testified that she generally does not view the cellblocks unless she is asked to do so. (ECF No. 108-23 at 12, 45:4-6.) There is no evidence that she was asked to view Maxwell's cellblock on June 28, 2017. However, it is undisputed that Gorski had access to a camera that was capable of seeing a blanket covering the window into Maxwell's cell. (ECF No. 108-23 at 12, 45:17-23.)

A suicide naturally leads to much hindsight speculation and "what if" questions. The fact that Gorski arguably could have prevented Maxwell's death if she had chosen to

monitor his cellblock is not enough to render her liable under the Fourteenth Amendment. There is no evidence that she saw the blanket over Maxwell's window before an inmate hit the emergency button. Nor is there a basis for finding that she was somehow obligated under the Fourteenth Amendment to monitor the cellblock for a blanket obstructing a window. Consequently, the plaintiff's claims against Gorski must be dismissed.

### 4.3.3.  Scott Koehnke

#### 4.3.3.1.  Liability

The plaintiff alleges that Scott Koehnke violated multiple jail policies by the manner in which he conducted the inmate count. (ECF No. 107 at 17-18.) He allowed inmates to "mill around" instead of standing by their cell doors; he allowed Maxwell to hang a blanket over the window in his cell; and, instead of actually seeing Maxwell, he allegedly relied on a slight movement of the blanket as proof that Maxwell was in the cell and well.

However, "[f]ailing to comply with jail policy does not amount to a constitutional violation on its own." *George v. Beaver Cty.*, 32 F.4th 1246, 1254 (10th Cir. 2022) (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)); *Pulera*, 966 F.3d at 551 ("a violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983").

Koehnke argues that, because he did not know that Maxwell was suicidal, his failure to remove the blanket was not unreasonable. (ECF No. 70 at 18.) But because it

was posted on a whiteboard in the cellblock (and he relied on that board for determining the correct number of inmates for his count (ECF No. 106-12 at 6, 21:11-12)), Koehnke knew or should have known that Maxwell was subject to a red tag.

Having said that, a red tag may be placed for reasons other than because the inmate is at an increased risk of self-harm, including if the inmate is diabetic or has a history of seizures. A red tag is simply a shorthand way of signaling that an inmate requires closer scrutiny because he is at a higher risk of harm. Consequently, while Koehnke may not have known why Maxwell had a red tag, he did know that he should pay closer attention to him than to inmates not subject to a red tag.

That Koehnke knew or should have known of Maxwell's red tag distinguishes *Peterson v. Yeates*, No. 1:08 cv 40 BCW, 2011 U.S. Dist. LEXIS 66330 (D. Utah June 21, 2011), on which Koehnke relies. In *Peterson*, an inmate obstructed his lower bunk with a blanket and committed suicide while behind the blanket. *Id*. at *16. Assuming the inmate was sleeping, an officer ignored the blanket. *Id*. The court granted summary judgment in the defendants' favor because the plaintiffs failed to show that the defendants knew that the inmate was suicidal. *Id*. at *29.

Koehnke nonetheless argues that a red tag "is insufficient to impute knowledge of a current risk of suicide, or to establish a claim of constitutional magnitude" because Maxwell

> was assessed and cleared by hospital staff before booking (where no suicide
> risk was detected), … indicated he was not suicidal during booking, … was

monitored by medical staff and refused medical care after booking, …
indicated he was not suicidal during a mental health assessment, a qualified
mental health provider indicated [he] was not a suicide risk and did not
recommend any suicide precautions, and [he] never indicated he was
suicidal, never requested medical care, and never requested mental health
services during the incarceration.

(ECF No. 70 at 19.)

However, there is no evidence that Koehnke knew any of these additional facts.
He knew only that Maxwell was subject to a red tag. Even if he knew these additional
details, they explain merely why Maxwell was not subject to more intensive scrutiny,
such as being placed in an observation cell or on suicide watch. By virtue of the red tag,
Koehnke knew that Maxwell merited closer supervision than an ordinary inmate in the
general population.

Whether it was unreasonable under the Fourteenth Amendment for Koehnke to
not require the blanket be removed during the inmate count is a question the court cannot
resolve on summary judgment. On the one hand, a covered window was neither unusual
nor always cause for alarm. Although it was technically a violation of jail rules, officers
frequently overlooked obstructed windows as a concession to inmate privacy, which is
not uncommon in jails. *Cf. Novak v. McIlvain*, No. 21-cv-81-jdp, 2022 U.S. Dist. LEXIS
187671, at *15 (W.D. Wis. Oct. 13, 2022) ("Novak's cell window was covered with toilet
paper. That didn't concern McIlvain because inmates often did the same thing when they
wanted privacy while using the bathroom."); *Kelley Vale-Gugliuzzi As Pers. Representative
of the Estate of Joshua Bellamy v. Layton*, No. 1:17-cv-03432-JRS-DML, 2020 U.S. Dist. LEXIS

113674, at *11 (S.D. Ind. June 29, 2020) ("Inmates usually cover their cell windows to use the restroom, block out light or sound, hide contraband, or attempt to harm themselves."). The plaintiff does not proffer facts to dispute Koehnke's testimony that he saw the blanket move and relied on that as proof that Maxwell was alive and well in the cell. There is no evidence that Koehnke knew of any additional relevant facts, such as that Maxwell had just returned from a hearing where his wife sought a restraining order against him and that he was emotional and crying, much less that he was suicidal. There is no evidence that Koehnke knew that the blanket had obstructed the cell window for roughly 45 minutes. He was merely passing through the cellblock for purposes of conducting a count, noticed the blanket, and did nothing after he saw it move slightly.

On the other hand, a jury could conclude that it was unreasonable for Koehnke to rely on the slight movement of a blanket as proof that Maxwell was alive and well. Many things other than an action by a person in the cell can cause a hanging blanket to move slightly or appear to move slightly to a person walking by. Koehnke did not have Maxwell shake the blanket (ECF No. 115, ¶ 75), which was the customary way, short of removing the blanket, to conduct a count when a blanket obstructed a cell window. When combined with the fact that Maxwell was subject to a red tag, a jury could conclude that it was unreasonable for Koehnke to rely on a slight movement of the blanket as a basis for not taking further action.

Finally, Koehnke argues that the plaintiff cannot prove causation. (ECF No. 70 at 21.) Koehnke's inaction resulted in, at most, a four-minute delay. Maxwell had covered his cell window roughly 45 minutes earlier, and so may have already been beyond help even if Koehnke had summoned help immediately upon seeing the blanket.

Whether Koehnke's inaction caused Maxwell's death involves medical and pathological questions that are not developed in Koehnke's brief. Although it is certainly possible that a jury would find that Koehnke's inaction was inconsequential, it is not an issue that the court can resolve in his favor at summary judgment. Therefore, the court must address whether he is entitled to qualified immunity.

### 4.3.3.2.    Qualified Immunity

A municipal employee who injures a person in violation of the constitution is personally liable for his actions. That means that the employee is ultimately responsible for paying any judgment. The municipality may indemnify the employee, *see* Wis. Stat. § 895.46, much as an insurance company steps in to pay a judgment against an insured, but the constitution does not require municipalities do so.

Government employees have argued that this threat of personal liability impairs their ability to do their jobs and is inconsistent with the public interest. *Cf. Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does.") They argued that, like

Case 2:20-cv-00386-WED   Filed 11/29/22   Page 21 of 43   Document 126

certain government officials, such as judges, *Pierson v. Ray*, 386 U.S. 547, 555 (1967), and prosecutors, *see Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), they are entitled to absolute immunity for actions taken within the scope of their employment. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

The Supreme Court recognized that, although absolute immunity would free government employees of the costs and distractions posed by litigation, those injured by an employee's unlawful conduct would be left without redress. *See Harlow*, 457 U.S. at 814. But holding government employees liable for any injury found to be in violation of the constitution may deter persons from government employment and result in government employees being found liable for conduct they had a good faith basis for believing was lawful. Constitutional law is complex and constantly changing; it is unreasonable to hold government employees personally liable for failing to predict new directions in constitutional law. *See Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("a police officer is not charged with predicting the future course of constitutional law").

Qualified immunity (sometimes called good faith immunity) developed as a compromise. It balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). A government employee can be found personally liable for injuries caused by his violation of the constitution but only if that conduct violates

"clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow*, 457 U.S. at 818).

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 337 (1986)). "Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 723-24 (7th Cir. 2013).

For purposes of qualified immunity, "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Id* (quoting *Anderson* v. *Creighton*, 483 U. S. 635, 640 (1987)).

The plaintiff asserts that it is well established that an inmate is entitled to protection against the risk of suicide. (ECF No. 107 at 24.) That argument, however, addresses the question of clearly established law at too high of a level of generality. This is not a case where Koehnke ignored an obvious known risk of suicide. *Cf. Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017) (stating that deliberate indifference to suicide

is clearly established). As noted, there is no evidence that Koehnke knew that Maxwell was imminently suicidal or even at an increased risk for suicide. All Koehnke knew was that Maxwell was subject to a red tag and therefore merited closer observation. The plaintiff has not pointed to any authority clearly establishing that under such circumstances it was unreasonable for a correctional officer to ignore a covered cell window.

In *Kelley Vale-Gugliuzzi as Pers. Representative of the Estate of Joshua Bellamy v. Layton*, No. 1:17-cv-03432-JRS-DML, 2020 U.S. Dist. LEXIS 113674 (S.D. Ind. June 29, 2020), a jail inmate covered the window in his cell with a blanket. *Id.* at *11. About 15 minutes later, a deputy walked through the cellblock and did not remove the blanket despite it being a violation of jail policy to obstruct windows and the fact that the inmate was being monitored for opiate withdrawal. *Id.* at *12. About 30 minutes later inmates opened the door to the cell and found that the inmate had hung himself with a bedsheet. *Id.* at *11. Without addressing the underlying question of liability, the court held that the deputies were entitled to qualified immunity because the plaintiff failed to identify any authority that would "provide notice to the deputies that failing to remove a blanket from an inmate's door … would violate clearly established law." *Id.* at *34.

In an effort to distinguish *Layton*, the plaintiff notes that the decedent in that case denied any past or current psychiatric issues and the deputies denied seeing the blanket covering the window. (ECF No. 107 at 24-25.) However, whether the deputies saw the

blanket was a factual dispute that the court was required to resolve in the plaintiff's favor at the summary judgment stage. And the decedent's lack of psychiatric history does not distinguish *Layton* from the present case because there is no evidence the Koehnke knew or should have known of Maxwell's psychiatric history.

The result here is the same as in *Layton*. The plaintiff must point to clearly established authority that would put a correctional officer on notice that he violates federal law if he fails to remove the blanket from the cell window of an inmate who merits closer supervision. The plaintiff having failed to identify any such authority, Koehnke is entitled to qualified immunity and the claim against him must be dismissed.

### 4.4. Claim Against the County

"[I]n enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (emphasis in original) (quoting *Monell,* 436 U.S. at 694)

"A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690; *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir.

Case 2:20-cv-00386-WED   Filed 11/29/22   Page 25 of 43   Document 126

2009)). "To demonstrate that the County is liable for a harmful custom or practice, the plaintiff must show that County policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Id.* (quoting *Gable v. City of Chi.*, 296 F.3d 531, 537 (7th Cir. 2002)). The policy must have been the "moving force" behind the constitutional violation. *Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Brown*, 520 U.S. at 404.

The plaintiff points to three alleged policies of the Outagamie County Jail as the basis for liability under § 1983: it required a verbal statement of suicidal intent before placing an inmate on suicide watch; it allowed inmates to cover their cell windows for long periods of time; and its "observation policy was deficient." (ECF No. 107 at 26.)

### 4.4.1. Suicide Watch Policy

The plaintiff asserts that Outagamie County had a policy of placing inmates on suicide watch only when the inmate verbalized current thoughts of self-harm or was actively self-harming. (ECF No. 107 at 29.) The plaintiff contends that "[b]ooking officers disregarded at least four serious indicators of acute suicide risk during the booking interview:" (1) Maxwell was a daily drinker of alcohol; (2) he recently used methamphetamine; (3) he had been diagnosed with depression and anxiety; and (4) he attempted suicide in the past six months. (ECF No. 107 at 27.) Although the plaintiff also notes that Maxwell had other risk factors, she fails to demonstrate that the jail knew those

facts. (ECF No. 107 at 27-28.) Thus, the court understands the plaintiff to be arguing that Maxwell was harmed by the jail's suicide watch policy because, given the risk factors the jail knew about, he should have been placed on suicide watch.

For present purposes the court presumes that the jail had such a de facto policy of requiring the inmate to express suicidal intent or to engage in self-harm before being placed on suicide watch. Such a policy, however, cannot support a claim against the county because it does not reflect deliberate indifference to the risk of inmate suicide. *See Pulera*, 966 F.3d at 551 ("Given Pulera's express statement that he was not considering suicide and the absence of more or more significant indirect signs, no rational jury could find that Gerber unreasonably placed Pulera in general population."). Nor has the plaintiff shown that, had Maxwell been initially placed on suicide watch, it would have been unreasonable to have removed him from suicide watch by the time of his death.

Suicide watch in a jail is not a benign designation. *Cf. Earl v. Racine Cty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) (per curiam) (addressing inmate's suit that defendants violated the Fourteenth Amendment by placing him on suicide watch). An inmate on suicide watch is segregated from the rest of the jail population and placed in a cell alone. (ECF No. 72-3 at 11, 43:22-24.) All of his clothing is taken away and he is given only a heavy-duty smock to wear. (ECF Nos. 72-2 at 5, 19:4-5; 72-3 at 11, 43:17-24.) He is given only a specialized "suicide blanket." (ECF No. 72-2 at 20, 79:19-21.) He is deprived of any personal property. (ECF Nos. 72-2 at 5, 19:4-6; 72-5 at 22, 88:15.) A camera is on him all

the time (ECF No. 109-9 at 22, 88:14), and an officer checks on him every 15 minutes (ECF No. 72-2 at 5, 17:5-9). Even his meals are different: he is given only "safety meals." (ECF No. 72-2 at 5, 19:7-8.)

Jail inmates routinely have suicide risk factors comparable to Maxwell. *Cf. Jutzi-Johnson*, 263 F.3d at 757 ("The population of prisons and jails is not a random sample of American citizens. It is largely a subset of the criminal population (not entirely, since some pretrial detainees are innocent of the crimes for which they are awaiting trial), itself a population prone to abnormal behavior, and the conditions of incarceration place the prisoners under considerable psychological strain. Abnormal behavior in jails and prisons is therefore common."). It would be unreasonable to expect a jail to place every inmate with suicide risk factors similar to Maxwell on suicide watch, and arguably unfair to all such inmates given that statistically very few are actually suicidal. It is reasonable for a jail to reserve these harsh conditions for extreme circumstances where no lesser means can reasonably protect the inmate. *See Pulera*, 966 F.3d at 551 (quoting *Matos*, 335 F.3d at 558 ("[N]ot every prisoner who shows signs of depression ... can or should be put on suicide watch.")). Those lesser interventions may be imperfect, but the Fourteenth Amendment requires only reasonableness. And, in any event, imperfect interventions fall far short of the deliberate indifference required under *Monell*.

The Outagamie County Jail had intermediate means of safeguarding inmates who were at increased risk of suicide but who did not demonstrate such an imminent danger

to themselves as to merit being placed on suicide watch. This included placing inmates in "observation" cells and placing a red tag to ensure that the inmate had a cellmate. The jail employed both of these practices for Maxwell. The jail also had a mental health professional evaluate him, and she determined that he no longer required observation and could be placed in the general population, albeit subject to a red tag. The jail also offered inmates mental health services, which Maxwell did not request.

Even if it were possible to conclude that the jail should have had a policy that placed Maxwell on suicide watch, the question is how long he should have been on suicide watch. Because the conditions of suicide watch are so harsh, it is inappropriate for a jail to keep an inmate on suicide watch any longer than reasonably necessary. With Maxwell having had time to adjust to incarceration, and for any withdrawal symptoms he may have experienced from his alcohol and methamphetamine use to have passed, there is little reason to suspect that he still would have been on suicide watch when he killed himself roughly six days after he was first incarcerated.

Therefore, the alleged policy neither reflected deliberate indifference nor harmed Maxwell.

### 4.4.2. Window Covering Policy

While the jail officially prohibited inmates from covering their windows, a jury could find that officers routinely ignored that rule and permitted inmates to cover the windows into their cells. Koehnke explicitly testified that the jail allowed inmates to cover

their cell windows for privacy (ECF No. 98-4 at 12, 47:14-18), and he was trained that, if a blanket covered a window during a count, he should either remove the blanket or have the inmate shake the blanket so he knew there was someone behind it (ECF No. 98-4 at 13, 49:1-6).

The jail had never had an inmate commit suicide while obstructing his cell window. While the absence of a prior incident is relevant to the foreseeability of the constitutional violation, a jail "does not get a 'one free suicide' pass." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). "[A] single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." *Id.* (quoting *Brown*, 520 U.S. at 399).

The plaintiff has failed to demonstrate that suicide was a highly predicable consequence of the jail's informal policy of allowing inmates to cover their cell windows with blankets. Highly predictable is distinct from merely foreseeable. For example, although it is foreseeable that an inmate may commit suicide behind an obstructed window, it is similarly foreseeable that an inmate provided sheets or clothes may use those articles to commit suicide. Yet it would be untenable to argue that a jail, by providing bedding and clothing to inmates, is liable under *Monell* merely because it is foreseeable that some would use those articles to kill themselves. Allowing inmates to temporarily obstruct their windows was a rare concession to inmate privacy. Given that the informal policy had never before contributed to an inmate suicide, it cannot be said

that a constitutional deprivation was a highly predictable consequence of the jail's informal policy of allowing inmates to obstruct their windows.

The plaintiff's *Monell* claim vis-à-vis the window covering policy fails for a second, independent reason—lack of causation. The jail's de facto policy was not that officers could simply ignore inmates when they obstructed their jail windows. As the plaintiff acknowledges (ECF No. 107 at 31-32), the de facto policy was to have the inmate at least shake the blanket or move it in some manner during inmate counts to indicate he was alive and well in the cell. (ECF No. 72-8 at 13, 49:16-24.)

Thus, there are two material components of the informal policy—allowing inmates to cover their cell window with a blanket and having inmates shake the blanket during inmate counts. Maxwell's injuries were not caused by the part of the policy allowing inmates to cover their cell window with a blanket because there is no evidence that any jail official noticed the blanket until Koehnke saw it during his count. Therefore, even if jail officials strictly enforced the policy prohibiting obstruction of cell windows, it would not have prevented the injury to Maxwell. There is no evidence, for example, that strict enforcement of a no obstruction policy would have deterred Maxwell from hanging his blanket over his window.

The part of the policy requiring the inmate to shake the blanket during counts in lieu of the officer seeing the inmate is inapplicable to the plaintiff's claim against the County because Koehnke did not comply with that part of the policy. Thus, the plaintiff's

Case 2:20-cv-00386-WED   Filed 11/29/22   Page 31 of 43   Document 126

injury was caused not by the policy but by an individual officer's decision to not follow it. A municipality is not liable for an individual employee's constitutional tort. *Brown*, 520 U.S. at 403.

Had Koehnke followed either the formal policy and removed the blanket or the informal policy and demanded that Maxwell shake the blanket, the result would have been the same and Maxwell promptly discovered. It is only because Koehnke relied on a perceived slight movement of the blanket—in violation of both the formal and informal policies—that the discovery of Maxwell was delayed.

Therefore, the county is not liable under *Monell* on account of its informal policy of allowing inmates to obstruct their jail windows.

### 4.4.3.  Inmate Observation Policy

The plaintiff notes that jail policy required an officer to personally observe each inmate only once every hour. (ECF No. 107 at 33.) Although observation could be supplemented by the video monitoring system, Gorski did not regularly do so. (ECF No. 107 at 33.) As a consequence, Maxwell was unobserved by jail staff for long periods of time, enabling him to obstruct his cell window and hang himself. The plaintiff argues that this policy reflected deliberate indifference to the threat of suicide by inmates. The plaintiff, however, cites no authority suggesting that a policy of jail staff observing inmates only once per hour reflects deliberate indifference to the known threat of suicide by inmates.

Case 2:20-cv-00386-WED   Filed 11/29/22   Page 32 of 43   Document 126

"[H]ourly rounds are constitutionally adequate." *Grochowski v. Clayton Cty.*, 961 F.3d 1311, 1320 (11th Cir. 2020) (citing *Cagle v. Sutherland*, 334 F.3d 980, 985 (11th Cir. 2003) (noting that a court approved a consent decree requiring hourly checks as a means to remedy unconstitutional conditions in a jail)). In fact, jails routinely employ hourly checks as a means of safeguarding inmates requiring closer supervision, *e.g.*, inmates who are not suitable for the general jail population. *See Jones v. Millspaugh*, No. 4:19-cv-00164-TWP-DML, 2021 U.S. Dist. LEXIS 129126, at *11 (S.D. Ind. July 12, 2021) (noting jail policy to check on inmates hourly when the inmate is not suitable to be in the general population); *Norman v. Wellpath, LLC*, No. 3:19-cv-02095-MO, 2022 U.S. Dist. LEXIS 86834, at *13 (D. Or. May 13, 2022) (noting jail policy requiring hourly checks of detoxifying inmates); *Estate of Vela v. Cty. of Monterey*, No. 16-cv-02375-BLF, 2018 U.S. Dist. LEXIS 145698, at *3 (N.D. Cal. Aug. 27, 2018) (noting jail policy requiring hourly checks of inmates in "lockdown pods").

Therefore, the county policy of observing inmates hourly was reasonable and did not evidence deliberate indifference to the known risk of suicide.

Because the county policies identified by the plaintiff do not reflect deliberate indifference to the known risk of suicide by jail inmates, the county is entitled to summary judgment.

### 4.5. Katrina Dorow-Stevens

Dorow-Stevens's only interaction with Maxwell occurred on June 24, 2017, when she met with him to assess whether he could be released from an observation cell and into the general jail population. Because she worked at the jail only on Saturdays, she was not at the jail at any other point during Maxwell's incarceration. Their meeting lasted 15 to 20 minutes. (ECF No. 95-6 at 29, 116:12-15.)

The plaintiff argues that Dorow-Stevens violated Maxwell's rights to adequate medical care and protection from self-harm under the Fourteenth Amendment because she did place him on suicide watch or, at a minimum, conduct a more complete mental health assessment. (ECF No. 110 at 15-24.) The plaintiff also argues that Dorow-Stevens should have obtained additional information by asking Maxwell additional questions, probing the answers he did give, and reviewing his medical record from his prior incarcerations.

Like a claim that the defendant violated the Fourteenth Amendment by failing to protect an inmate from self-harm, "[a] § 1983 claim that a state pretrial detainee has received inadequate medical care is predicated on the rights secured by the Fourteenth Amendment's Due Process Clause." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020) (citing *Miranda*, 900 F.3d at 346-47). Such claims "are subject to an objective-reasonableness standard." *Id*. "The plaintiff bears the burden to demonstrate objective unreasonableness, and he must make a twofold showing. First, he must show that the defendant acted

purposefully, knowingly, or recklessly when considering the consequences of his response to the medical condition at issue in the case. Second, the plaintiff must show that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *Id.* (citation omitted).

When Dorow-Stevens met with Maxwell, she had reviewed his booking form. Therefore, she knew that he was a daily drinker, was intoxicated when he was booked, had used methamphetamine about a day before his arrest, had been diagnosed with depression and anxiety, was not on any medication, and had attempted suicide in the past six months. (ECF No. 110 at 17.) Dorow-Stevens also knew that a correctional officer had reported that Maxwell appeared "emotional" when he was in the holding cell and that a social worker had called the jail to relay concerns that someone (she speculated it was a family member) had about Maxwell's mental health.

The court assesses Dorow-Stevens's conduct under the totality of the circumstances. By the time she met with Maxwell, he had been in custody for about two days. He had spent those two days on observation, during which he appeared "emotional" but had not requested mental health services, exhibited any self-harming behavior, or articulated any intent to harm himself. The risk factors on which the plaintiff places much emphasis—Maxwell's intoxication and his withdrawal from drugs and alcohol—were no longer relevant because, in the two days Maxwell had been in custody,

his intoxication would have passed and there is no evidence that he was at any further risk of suffering withdrawal.

The plaintiff does not describe what sort of information Dorow-Stevens would have found in Maxwell's jail medical records other than to suggest that, had she reviewed them, "it is likely she would have found out about William's 72-hour hold hospitalization fewer than two weeks prior to his June 22, 2017 incarceration." (ECF No. 110 at 20.) The plaintiff offers no explanation as to why that fact likely would have been revealed in Maxwell's medical records. Nor does the plaintiff articulate how that fact should have altered Dorow-Stevens's actions regarding Maxwell.

The plaintiff does not specify what additional questions Dorow-Stevens should have asked Maxwell, much less speculate as to what information she likely would have learned or how that information should have changed her recommendations. Although the plaintiff argues that Dorow-Stevens's evaluation was not a proper suicide assessment, she does not explain in what way it was lacking or how any deficit was material. The plaintiff has not, for example, presented evidence that any additional questioning would have led to Maxwell stating he was suicidal or led to evidence that objectively merited different actions by Dorow-Stevens. In fact, there is no evidence that Maxwell actually was suicidal when he met with Dorow-Stevens. Although the plaintiff notes that Maxwell called his former wife from the jail and said that he was having regular thoughts of suicide, those calls occurred after he met with Dorow-Stevens.

The plaintiff also argues that a reasonable understanding of Maxwell's statement that he did not expect to be in the jail long enough to receive medication was that he intended to kill himself. But Maxwell said that amidst comments that he was anxious to get into the general population so he could get to a phone and contact someone who would be able to post his bail. The only reasonable understanding of his statement was the one that the plaintiff acknowledges Dorow-Stevens apparently had (ECF No. 110 at 19)—Maxwell expected to soon post bail and be released from jail.

The plaintiff also criticizes Dorow-Stevens for not reviewing the office voicemail before meeting with Maxwell. Had she done so, she would have heard a message from Faul wherein she allegedly conveyed that Maxwell had said that he would rather kill himself than go to prison. (ECF No. 108, ¶ 25.) While the voicemail supported Maxwell's suicidal tendencies, it did not suggest that Maxwell was imminently suicidal. Rather, it suggested that, if in the future he were convicted and sentenced to prison, he would then be at risk of suicide. Moreover, although Dorow-Stevens apparently did not know this specific information, she was aware that someone, probably a family member, had expressed concern for Maxwell's mental wellbeing. Thus, the plaintiff has not demonstrated that it would have been unreasonable for Dorow-Stevens to follow the same course of action had she listened to the voicemail. She addressed the concern for Maxwell's mental health with Maxwell, and Maxwell denied knowing why anyone would say such a thing.

Finally, the plaintiff criticizes Dorow-Stevens for not completing her progress notes in the standard format used by WellPath. Again, there is no indication that the format of Dorow-Stevens's notes was material. In any event, "a violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983." *Pulera*, 966 F.3d at 551.

In light of all the facts, Dorow-Stevens's actions were reasonable under the Fourteenth Amendment. Psychologists are not psychics. No means exist for perfectly predicting whether a person will harm himself. The Fourteenth Amendment requires reasonableness, not omniscience. The fact that Maxwell had been diagnosed with anxiety and depression, had been prescribed psychiatric medications, had been emotional while in custody, and had attempted suicide within the past six months did not necessarily merit placing him on suicide watch. This is especially true given that he had already been subject to observation in the jail for two days and, "most dispositively," denied feeling suicidal. *See Jump*, 42 F.4th at 793-94 ("First, and most dispositively, we have no facts that Marciniak told Sgt. Smith or Officer Taraboi he was suicidal. In fact, Sgt. Smith testified Marciniak had affirmatively told both the opposite.") (citing *Pulera*, 966 F.3d. at 554 (state official "was not even negligently responsible for a suicide risk that Pulera never told her about")).

Moreover, Dorow-Stevens did not ignore Maxwell's risk of self-harm. She required that he be subject to a red tag if he was placed in the general jail population.

Under the totality of the circumstances, this was an objectively reasonable means of addressing the risk of self-harm. That her actions did not prevent the harm does not render her liable under the Fourteenth Amendment. *Szopinski v. Koontz*, 832 F. App'x 449, 452 (7th Cir. 2020) ("A defendant cannot be liable if they respond reasonably to a risk, even if the harm was not averted." (citing *Orlowski v. Milwaukee Cty.*, 872 F.3d 417, 424 (7th Cir. 2017)).

Consequently, Dorow-Stevens is entitled to summary judgment.

### 4.6. WellPath

The plaintiff contends that WellPath had two informal policies that render it liable under *Monell*: an informal policy that required an inmate either state he was suicidal or engage in self-harm before being placed on suicide watch; and a custom of ignoring communications from persons outside the jail. (ECF No. 110 at 25-26.)

A private entity that contracts with a county to provide medical care to inmates is a state actor for purposes of § 1983. *Miranda*, 900 F.3d at 347 (citing *West v. Atkins*, 487 U.S. 42, 54-56 (1988)). Even if the plaintiff's *Monell* claim is not foreclosed by the court's conclusion that the actions of Dorow-Stevens (WellPath's employee) were reasonable, it nonetheless fails on its merits.

The plaintiff has failed to present evidence that WellPath actually had a policy of limiting suicide watch to inmates who stated they were suicidal or who harmed themselves. In fact, Dorow-Stevens testified that she relied on far more than just an

inmate's statements when assessing whether suicide watch was appropriate. (ECF No. 121 at 6-7.) Thus, while an inmate harming himself in the jail or acknowledging feeling suicidal may be certain to result in him being placed on suicide watch, they were not the only way. (ECF No. 121 at 6-7.)

Even if Dorow-Stevens had placed Maxwell on suicide watch on June 24, 2017, there is no evidence that it would have prevented him from killing himself four days later. Because suicide watch is only a temporary means of protecting an inmate from himself during acute psychological distress, there is no evidence that Maxwell still would have been on suicide watch on June 28, 2017. And because, as the plaintiff acknowledges, suicide watch does not treat an inmate's symptoms (ECF No. 110 at 16 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (7th Cir. 1998)), a few days on suicide watch would not have prevented him from committing suicide once he was placed in the general population.

Nor has the plaintiff demonstrated any custom of ignoring calls from outside the jail. The plaintiff points only to a single instance of Dorow-Stevens not checking the office voicemail. There is no evidence that she did not check the office voicemail because of any standard custom or practice of WellPath. The plaintiff also notes that the jail's fulltime mental health coordinator, Josette Smith, did not follow-up on Faul's voicemail. (ECF No. 110 at 28.) But, again, the plaintiff does not point to evidence that this was the result of any WellPath policy or custom.

In any event, Dorow-Stevens's failure to check the voicemail did not contribute to Maxwell's suicide. As noted above, the voicemail did not indicate that Maxwell was imminently suicidal, and Dorow-Stevens discussed with Maxwell the fact that a family member expressed concerns for his mental health.

Therefore, WellPath is entitled to summary judgment.

## 5. Conclusion

Maxwell's death was tragic. A municipality and its employees, however, do not violate the constitution merely because they fail to prevent a tragedy.

The plaintiff's claim under the Eighth Amendment and the Wisconsin Constitution are dismissed. Because Maxwell was a pretrial detainee at the time of his death, the plaintiff has no claim under the Eighth Amendment. Wisconsin law does not authorize private claims for damages for alleged violations of Article 1, Section 6 of the Wisconsin Constitution. And the jail is dismissed because it is not a suable entity distinct from the county.

The county and all county employees are entitled to summary judgment. The plaintiff has not presented evidence that Geenan and Gorski deprived Maxwell of any constitutional right. As for Koehnke, while his failure to observe Maxwell may have been unreasonable under the Fourteenth Amendment, he is nonetheless entitled to qualified immunity. The plaintiff has failed to show that it was clearly established that, under the

circumstances presented, a correctional officer violates the constitution if he fails to observe an inmate during an inmate count.

The county is entitled to summary judgment because the evidence does not support a claim under *Monell*. The county's suicide watch, window obstruction, and inmate observation policies did not reflect deliberate indifference to the known risk of suicide.

Dorow-Stevens and her employer, WellPath, are likewise entitled to summary judgment. Dorow-Stevens did not violate the Fourteenth Amendment by either depriving Maxwell of adequate medical care or failing to protect him from self-harm. Her actions were reasonable under the totality of the circumstances. As for WellPath, the plaintiff has failed to demonstrate that it had any policy or custom that reflected deliberate indifference to the Maxwell's rights under the Fourteenth Amendment or that any such policy or custom harmed Maxwell.

Having concluded that all the defendants are entitled to summary judgment, the motions related to experts (ECF Nos. 87, 90, 93, 96) are moot and dismissed as such.

**IT IS THEREFORE ORDERED** that the motion for summary judgment filed by Fay Geenan, Ann Gorski, Scott Koehnke, Outagamie County, and the Outagamie County Jail (ECF No. 68) is **granted**.

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by Katrina Dorow-Stevens and WellPath (ECF No. 78) is **granted**.

**IT IS FURTHER ORDERED** that the motions related to experts (ECF Nos. 87, 90, 93, 96) are **dismissed as moot**.

**IT IS FURTHER ORDERED** that this action is **dismissed**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 29th day of November, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge